# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) ) ) |
| vs. | ) Case No. 16-CR-30114-SMY |
| MARIO A. RODRIGUEZ-ESCALERA, | ) ) ) |
| Defendant. | ) |

## ORDER

Before the Court is Defendant Mario Rodriguez-Escalera's Motion to Suppress Evidence (Doc. 60). For the following reasons, Defendant's motion is **GRANTED**.

## FACTS[1]

On October 4, 2016, at approximately 3:01 p.m., Illinois State Trooper Kenneth Patterson was travelling east on Interstate 70 near milepost 21 when he observed a car ahead of him change lanes without signaling. He pulled alongside the car and noted that the vehicle was occupied by the driver (Defendant Blanca Silvia Moran) and a front seat passenger (Defendant Mario Rodriguez-Escalera). Patterson pulled the car over and initiated a traffic stop.

Patterson approached the passenger side of the vehicle and asked Moran for her license. Moran gave him her driver's license, proof of registration and proof of insurance. Her documentation indicated that she was from Paramount, California, which is near Los Angeles. Patterson informed her that he was going to issue her a warning and requested that she come to

---

[1] Defendant Blanca Silvia Moran filed a motion to suppress asserting the same arguments presented in Defendant Rodriguez-Escalera's motion. The Court held an evidentiary hearing on Moran's motion on February 8th and 10th, 2017. By consent of Defendant Rodriguez-Escalera and the Government, the Court adopts the findings of facts made on the record during the evidentiary hearing and enumerated in its May 30, 2017 Order (Doc. 90), without the need for an additional evidentiary hearing.

his squad car. According to Patterson, it is his routine practice to bring drivers detained for traffic stops because it makes people more comfortable with police.

As Moran went to his squad car, Patterson returned to her vehicle and asked Rodriguez-Escalera for his identification. While Rodriguez-Escalera retrieved his identification, Patterson asked him where he and Moran were going. Rodriguez-Escalera responded that they were going to Pennsylvania and handed him two Mexican identification cards. Patterson gave one of the ID cards back to Rodriguez-Escalera and returned to his squad car with the other.

While he was reviewing Defendants' documentation, Patterson questioned Moran. She told him that Rodriguez-Escalera was her fiancé, that she worked as an insurance broker and tax professional and that they were coming from California and going to New York. When Patterson asked Moran where specifically they were going in New York, she stated, "I want to see Manhattan, Brooklyn, the what do you call it, and uh, Statue of Liberty." She also stated that she had not secured lodging in New York.

The records check revealed that Moran's driver's license was suspended. Patterson informed Moran that her license was suspended and questioned her about it. She stated that she had recently received a ticket in California, but was not aware that her license was suspended. Patterson asked her if Rodriguez-Escalera had a license and she stated that he had a Mexican license. Patterson then returned to Moran's car to obtain Rodriguez-Escalera's driver's license. As he examined it, Patterson asked Rodriguez-Escalera where in Pennsylvania they were going and for how long. He responded that he did not know where in the state they were going and that the trip was to last "one or two days." He also stated that they were not going to visit family or friends and had no additional stops planned.

Patterson then returned to his car and told Moran that Rodriguez-Escalera would need to drive and that he was going to issue her a ticket for driving on a suspended license. He asked her whether they were going any place other than New York and she said they were not. Patterson then asked Moran if Rodriguez-Escalera knew they were going to New York. Moran replied that he thought they were going to Pennsylvania, but that she was going to surprise him with a trip to New York. She also told Patterson that she planned for them to be on the trip for two weeks.

Approximately 21 minutes after initiating the traffic stop, Patterson requested a K-9 unit to the scene. A few seconds after the K-9 unit arrived, Patterson handed Moran the warnings and citation and stated, "He's [Mario] going to drive from here. However, there is a K-9 behind us that is going to walk around the vehicle real quick for us. So can you close the door real quick? The dog can be aggressive and I don't want him to bite you, okay." The dog completed its sniff without alerting. Patterson returned to his squad car where Moran remained detained and the following conversation then took place:

> Patterson: Ma'am, is there anything illegal in the car at all that I should know about?
>
> Moran: No.
>
> Patterson: Okay. Um…
>
> Moran: What?
>
> Patterson: Just making sure there is nothing illegal. Just making sure that you guys are actually going to where you're going to, okay? And not Pennsylvania...you're actually going to New York?
>
> Moran: Yes, New York.
>
> Patterson: What kind of possessions do you have in your vehicle, right now, what do you have?
>
> Moran: What kind of what?

| | | |
|---|---|---|
| Patterson: | Any luggage at all? Any bags? | |
| Moran: | Well, my luggage. | |
| Patterson: | Is there any luggage that anyone gave you to take along to New York at all? | |
| Moran: | No. | |
| Patterson: | No. Okay. You're free to go and everything but I'm just concerned that there might be something illegal inside the car. Usually, most people don't say 'hey, let's go on a trip'. And then, they...it's a surprise, they go to New York. It's kind of out of the ordinary I should say. I know that probably doesn't make any sense to you. | |
| Moran: | No. | |
| Patterson: | Does that not make any sense to you? A strange trip? | |
| Moran: | No. I take my vacations. | |
| Patterson: | Yeah, but telling someone you are actually going to Pennsylvania and then actually you are going to New York, that's kind of out of the ordinary as far as a trip goes, itinerary wise. Can I search that vehicle and its contents... | |
| Moran: | Sure. | |
| Patterson: | To make sure there is nothing illegal, is that alright? | |
| Moran: | (nodding yes) | |
| Patterson: | I'll just have you stay in the vehicle and I'll have him step out. | |

A search ensued which resulted in the discovery of approximately 7.5 lbs. of methamphetamine and $27,800 in cash.

## **DISCUSSION**

Defendant Rodriguez-Escalera asserts that Trooper Patterson's unreasonably prolonged traffic stop constituted an unconstitutional seizure. Rodriguez-Escalera further contends that any

suspicion of criminal activity was allayed by the negative dog sniff, that the post-sniff questioning was unlawful and that Co-Defendant Moran's subsequent consent to search the vehicle was involuntarily and tainted by the unconstitutional detention.

The Government maintains that Rodriguez-Escalera lacks standing to challenge the search of Moran's vehicle because he had no legitimate expectation of privacy in the car. The Government further contends that Trooper Patterson's reasonable suspicion of criminal activity justified the prolonged stop and that the post-sniff interaction, including the search, was consensual.

### *Standing*

"One of the central distinctions courts have drawn ... is that between a driver of a car and a passenger." *United States v. Walton*, 763 F.3d at 666. Generally, a "mere passenger" lacks standing to challenge a search because a passenger cannot prevent the driver or owner of the car from inviting other persons to enter the vehicle, including police. *United States v. Walton*, 763 F.3d 655, 666 (7th Cir. 2014). However, two exceptions to this rule do allow a passenger to challenge a search of a vehicle. The first exception, where the passenger asserts a property or possessory interest in the vehicle (*see Rakas v. Illinois*, 439 U.S. 128, 129 (1978)), does not apply. Rodriguez-Escalera cannot assert a property or possessory interest in Moran's car. He had no ownership interest in the vehicle nor did he have control over it as a passenger.

The second exception is triggered when a passenger's person is seized, such as when police stop the car. *Walton*, 763 F.3d at 666. The passenger then has standing to challenge the seizure of his person as well as the search that resulted from the seizure, if the seizure was unlawful. *See Brendlin v. California*, 551 U.S. 249, 255 (2007). Here, as soon as Moran's vehicle was stopped, Rodriguez-Escalera was seized within the meaning of the Fourth

Amendment. *Arizona v. Johnson*, 555 U.S. 323, 332 (2009) ("[A] passenger is seized, just as the driver is 'from the moment [a car stopped by the police comes] to a halt on the side of the road.'"). Thus, the only issue is whether the seizure was reasonable.

### *Seizure and Search*

The Supreme Court's decision in *Rodriguez v. United States*, 135 S.Ct. 1609 (2015) guides this Court's analysis as to whether the seizure was reasonable and. Under *Rodriguez*, a traffic stop becomes an unlawful seizure if, in the absence of reasonable suspicion of criminal activity, its duration extends the time reasonably necessary to issue a ticket for the violation. "Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Id.* at 1614 (citation omitted). "An officer... may conduct certain unrelated checks during an otherwise lawful traffic stop[,]…[b]ut... he may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual." *Id.* at 1616.

Moreover, "[i]n assessing whether a detention is too long in duration to be justified as an investigative stop," it is proper "to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly." *United States v. Sharpe*, 470 U.S. 675, 686, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985). Ultimately, both the reasonableness of Trooper Patterson's suspicion and of the duration of the stop are to be determined based on the totality of the circumstances.

During the hearing, Patterson testified that he was suspicious that the Defendants were engaged in criminal activity based on his training and experience and his perception that Defendants' travel itineraries were conflicting and implausible, that Defendants acted nervously and evasively throughout the stop, that their point of origin was a known drug distribution point,

and the presence of "numerous" and "pungent" air fresheners in the vehicle. As a result, he requested that a drug-sniffing dog be dispatched to the scene.

Specifically, Patterson testified that when he approached the car on the passenger side, Rodriguez-Escalera "remained unaware of my presence. He remained looking at his phone the entire time, appeared as if he was playing a video game on his telephone and did not acknowledge my presence whatsoever." While the Court has no quarrel with Patterson's assertion that generally, a passenger's failure to acknowledge him is not normal, the Court also notes that, initially, Patterson was not speaking specifically to Rodriguez-Escalera. When he did speak to him directly to ask about the trip and to get his ID, he answered. Moreover, there is no indication that Rodriguez-Escalera appeared nervous once engaged. Under the circumstances, not interacting with a police officer until one has been asked to do so, and then, when engaged, answering the officer's questions and complying with his requests, is by itself, insufficient to raise reasonable suspicion.

As the Government correctly points out, passengers' reporting inconsistent travel plans can support reasonable suspicion. *United States v. Patterson*, 65 F.3d 68 (7th Cir. 1995); *United States v. Mason*, 628 F.3d 123 (4th Cir. 2010) (different stories from passengers regarding where they had been supported reasonable suspicion). However, in this case, there was no absolute conflict in the travel plans reported by the defendants. "New York for two weeks" is obviously a different answer than "Pennsylvania for two days." That said, additional information that Trooper Patterson received from Moran objectively diminishes the possible conflict.

While nervousness, alone or in combination with other factors, can raise a reasonable suspicion of criminal activity, *Illinois v. Wardlow*, 120 S.Ct. 673 (2000), the Court does not find that Defendant Moran exhibited such nervousness. Trooper Patterson points to what he believes

was inappropriate laughter during some of her responses, her being overly chatty, and a speaking style that he found odd.[2] Specifically regarding her somewhat jocular response to the question of whether she'd ever been arrested before, Trooper Patterson testified that "I only see that in terms of when someone is trying to be deceitful or lie." He also categorized her laughter as what he has been trained to identify as "jump off points"…responses intended to buy time for the person being questioned to formulate a lie.

Despite Patterson's assertion that people only joke around him when intending to lie, there are a many tense, serious situations, including a questioning by a police officer, during which a law-abiding person might laugh or attempt to interject humor. Given the circumstances and the various ways that different people handle stressful situations, the Court rejects the Government's suggestion that such a response necessarily evidences deception or that nervousness is inherently suspicious. Additionally, the Court's own review of the traffic stop video does not support the conclusion that Moran appeared suspiciously nervous or acted inappropriately. Rather, Trooper Patterson's testimony and the video show that over the course of approximately 30 minutes, during an ostensibly routine traffic stop, Moran was made to sit in a police car and was asked a number of questions by a state trooper. She answered his questions, affirmatively engaged with him and was relatively calm and collected throughout the stop.

When combined with other factors, an excessive number of air fresheners in a vehicle can support a finding of reasonable suspicion during a traffic stop. *United States v. Wilkie*, 182 Fed. App'x 533 (7th Cir. 2006); *United States v. Patterson*, 65 F.3d 68 (7th Cir. 1995). In this case, Trooper Patterson testified that when he came up to the window of the vehicle, "there was a very pungent smell of air fresheners" and that he observed "several" clip in type fresheners in the

---

[2] For instance, when asked where she was going, she said that she wanted to go to certain places in New York, as opposed to affirmatively stating that she would go to those places.

front dashboard of the car (Doc. 63, pgs. 16-17). These facts, along with the previously discussed factors purportedly triggered Patterson's suspicion that Defendants were involved in criminal activity. However, photographs introduced by the Government during the hearing contradict Patterson's testimony. The photographs show that there were 2, not several, air fresheners in the front seat compartment of the vehicle. Two additional fresheners were found in the backseat of the vehicle during the post-incident search, however, as Patterson does not claim to have observed them during the stop, they cannot have played a role in his suspicion. Accordingly, the Court concludes that the proffered factors, individually and in combination, are insufficient to support the Government's claim that Trooper Patterson had a reasonable suspicion of criminal activity to justify a prolonged traffic stop.

Further, it is clear that Trooper Patterson intentionally prolonged the stop in order to allow the K-9 unit, which was unavailable at the beginning of the stop, time to arrive on the scene. Patterson testified that he was aware that the K-9 unit was unavailable when he initiated the stop. He monitored the unit's movements and availability throughout the stop. The video shows that it took 281/2 minutes for Patterson to write and issue the warnings and citation. The video further shows that Patterson did not begin to write the citation until he received notification that the K-9 unit was free to join him and that he did not issue the tickets until he knew that the K-9 unit had arrived.

The Court does not find credible Patterson's testimony that the delay in issuing the citation and warnings was due to a new warning issuance system and the fact that he was having trouble finding the statutes. The Court's review of the video, which includes long stretches in which Trooper Patterson does not appear to be doing anything but sitting, leaves it with the firm impression Patterson's lack of expediency was deliberate…he was stalling. Even if the Court

were to accept Patterson's explanation, in light of the totality of circumstances, the duration of the stop and, therefore, Rodriguez-Escalera's detention and seizure was unreasonable and does not pass constitutional muster.

Additionally, Moran's consent to the search of her vehicle was involuntary. A court making the determination as to whether a consent to search is voluntary must consider "the totality of the circumstances," including "[the defendant's] age, education, and intelligence; whether he was advised of his constitutional rights; how long he was detained prior to consent; whether he consented immediately or after police made several requests; whether the police used physical coercion; and whether he was in custody." *United States v. Ruiz*, 785 F.3d 1134, 1146 (7th Cir. 2015).

No reasonable person would have felt free to leave under the attendant circumstances.[3] *See, e.g., United States v. Borostowski*, 775 F.3d 851, 859 (7th Cir. 2014) (collecting cases). Further, Moran was not advised of her constitutional rights. Significantly, she had been in Trooper Patterson's car for over 30 minutes by this point, and had only minutes before been told to close the door because an aggressive police dog was nearby. Under these facts, the Court concludes that Moran's consent was not voluntary.

For the foregoing reasons, Defendant's Mario A. Rodriguez-Escalera's Motion to Suppress (Doc. 60) is **GRANTED**.

**IT IS SO ORDERED.**

**DATED: June 21, 2017**

**s/ Staci M. Yandle**
**STACI M. YANDLE**
**United States District Judge**

---

[3] The Court notes that at the same time when Patterson told Moran she was free to leave, he told her that he was suspicious and requested to search her car.